# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00299-CV

**Gary C. Quintinsky, Appellant**

**v.**

**Texas Mutual Insurance Company, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT
### NO. D-1-GN-06-003093, HONORABLE ORLINDA NARANJO, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Gary C. Quintinsky appeals a judgment awarding Texas Mutual Insurance Company $5,077,390 in compensatory damages and $2,500,000 in exemplary damages. Texas Mutual's central theory at trial was that Quintinsky fraudulently induced Texas Mutual into issuing insurance policies to companies that Quintinsky owned and operated by misrepresenting the companies' payroll in order to evade Texas Mutual's experience-rating system. In four issues on appeal, Quintinsky challenges the legal and factual sufficiency of the evidence supporting various jury findings, asserts that the district court erred when it denied his motion for judgment notwithstanding the verdict, and contends that Texas Mutual made an incurable jury argument regarding exemplary damages. We will affirm the judgment.

## BACKGROUND

Since 2001, Texas Mutual has been the State of Texas's worker's compensation insurer of last resort. That is, if an applicant would be rejected for workers' compensation insurance under Texas Mutual's underwriting standards, the company may not reject the risk, but shall insure the risk at a higher premium as provided by the company's requirements. Tex. Ins. Code Ann. art. 5.76-4(b) (West Supp. 2006-07) (current version at Tex. Ins. Code Ann. § 2054.351(b) (West Supp. 2007)).[1] The insurance code further provides that a policyholder shall fully disclose to the policyholder's insurance company information concerning the policyholder's ownership, change of ownership, operations, or payroll. *Id*. art. 5.65B(a) (West Supp. 2006-07) (current version at Tex. Ins. Code Ann. § 2051.101(a)(1) (West Supp. 2007)).

At trial, Grace Turner, a supervisor in Texas Mutual's Special Investigations Department, explained Texas Mutual's insurance application process. In the application, the employer provides estimates of its payroll for the coming year. Based on this estimate, an estimated premium is charged. Then, an auditor "will go and get all of the payroll information and charge accordingly." In other words, an estimated premium is paid up front, and, later, when the actual payroll is determined, there will result either a refund of a portion of the premium or an additional charge for more premium that is due.

---

[1] In 2005, the legislature enacted a nonsubstantive revision of the insurance code, effective April 1, 2007. *See* Act of May 24, 2005, 79th Leg., R.S., ch. 727, § 18, 2005 Tex. Gen. Laws 1752, 2187. Because the revisions operate prospectively, we will cite to the code provisions in effect at the time Texas Mutual's cause of action arose.

Turner explained that the premium is calculated based on a formula that includes a dollar amount of payroll and a rate based on the specific class code that is assigned to that payroll based on the workers' risk of injury. For example, an office worker has a lower rate than a crane operator. These two factors determine the "base premium." Once the base premium is determined, the next step is to apply an "experience modifier," which is a multiplier based on the "loss history" of the company. According to Turner, all employers start out with a modifier of 1.0, which has no impact on the employer's base premium. Over time, that modifier will increase or decrease depending on the amount of claims that the employer files. An experience modifier of less than 1.0 is assigned to employers who are perceived to be less of a risk than the average employer. An experience modifier of more than 1.0 is assigned to employers who are perceived to be a greater risk than the average employer. The higher the modifier, the higher the premium.

Texas Mutual alleged that Quintinsky was the true owner and operator of the United Crane Companies (United Crane, United Crane Sales and Leasing, International Holdings, Conroe United, Austin United, United Payroll Services, and United Fleet Maintenance), which rented telescopic boom cranes, with or without operators, to petrochemical and general building contractors throughout the State of Texas. Texas Mutual also alleged that in 1994, Quintinsky sold the assets of the United Crane Companies to Ellynn Ogilvie, an employee of the United Crane Companies (and Quintinsky's alleged "live-in girlfriend") but continued to exercise control over the business. The United Crane Companies were insured by Texas Mutual for the policy years 2000-2001, 2001-2002, 2002-2003, and 2003-2004.

Turner testified concerning how Texas Mutual conducted the audits on the United Crane Companies. The auditor looked at three types of documents: unemployment reports filed with the Texas Workforce Commission, federal income tax forms, and payroll journals. The United Crane Companies provided these documents to Texas Mutual, and Texas Mutual would compare the payroll information on the documents "to make sure they matched up." According to Turner, the auditor does not normally go beyond the documents provided by the employer, and he usually accepts the truth of what the employer is telling him. Turner testified that Texas Mutual performed an audit on the United Crane Companies in the above manner for three of the four years in which it insured the companies.[2]

Turner recounted that Texas Mutual ran a query on its "high modifier accounts" and noticed that the United Crane Companies had a modifier greater than 3.0. This meant that the United Crane Companies was paying premiums in an amount more than three times what a business would normally pay. Turner explained that a high modifier is a motivator for an insured to commit fraud. After the discovery of the high modifier, Texas Mutual "ran a check to see if there were any similar or other operations at the same location" as the United Crane Companies. This was done, Turner explained, because "when payroll is hidden, it's usually hidden in a company that has a similar address as the insured that we cover." Texas Mutual noticed that there were "a lot of the companies at the same location listed on the policy, but there was . . . one company that was not listed." In response to this discovery, Texas Mutual obtained payroll information on the

---

[2] An audit was not attempted during the fourth year because at that time, according to Turner, Texas Mutual had discovered that the United Crane Companies had not been truthful in their prior audits.

4

United Crane Companies directly from the Texas Workforce Commission. Turner testified that "when the numbers [from the Texas Workforce Commission] came back, they were not even close" to the payroll numbers that the United Crane Companies had reported to Texas Mutual. In fact, Texas Mutual discovered that there were "millions of dollars of difference between what was given to the auditor and given to [the] Texas Workforce Commission." This discrepancy indicated to Turner that the reports shown to the auditor "weren't the true and correct copies of the ones that were filed with the State" and had been falsified. Turner suspected that the payroll journals provided by the United Crane Companies to Texas Mutual were "probably altered as well." However, she had "no idea" whether the federal income tax forms provided by the United Crane Companies to Texas Mutual had been altered.

The jury also heard evidence that, in 2004, the United Crane Companies became financially troubled and Ogilvie sold the companies' assets to a "new" company owned and operated by Quintinsky, United Crane Rental, Inc. This company was also insured by Texas Mutual. Texas Mutual maintained that, at the time it issued the policy, it was unaware of the connection between United Crane Rental and the United Crane Companies. United Crane Rental's 2005-2006 insurance policy and its application for insurance were admitted into evidence. On the application, Quintinsky represented that he did not have controlling management or control of any other businesses, and that he did not receive workers from or share workers with any business. Specifically, Quintinsky stated that there were "no entities with payroll."

The United Crane Companies were located at 5855 Kelley Street in Houston. Quintinsky had represented that the address for United Crane Rental was 4042 Piping Rock Lane

(also in Houston). Texas Mutual later discovered that the Piping Rock Lane address was Quintinsky's home address, and that United Crane Rental was actually physically located at the Kelley Street address, the same location as the United Crane Companies. Turner testified that one of the ways an insured may try to deceive its insurer is by hiding payroll in other companies that either share a same address or that are commonly managed. According to Turner, listing a home address as opposed to a business address "could make [Texas Mutual] think that [United Crane Rental] was a truly separate operation." Turner also testified that when Texas Mutual attempted to perform an audit on United Crane Rental at the 5855 Kelley Street location, Quintinsky refused to let the auditors enter his companies' offices. Turner added that at the time Quintinsky applied for insurance for United Crane Rental, the United Crane Companies had an experience modifier of 3.11, providing him a motive to contrive a scheme to obtain worker's compensation coverage through a "new" business, which would start with an experience modifier of 1.0. Once Texas Mutual formed the opinion that Quintinsky was attempting to avoid the high modifier of the United Crane Companies by operating the entire business through United Crane Rental, Texas Mutual canceled United Crane Rental's insurance policy.

The jury also heard testimony from Cheryl Wilson, an accountant for the United Crane Companies from 1995 to 2003. Wilson testified by video deposition that she stopped working for the United Crane Companies partly because she was asked "to print some financial statements that weren't accurate." Wilson explained,

> Well, at that point [the financial statements] weren't complete and I didn't want to complete them and they were telling me, you know, "We need the numbers to be"

6

this and this and I didn't think that would be accurate numbers. And so I didn't get involved with them. And I just felt like at that point it was better for me to leave.

When questioned about who asked her to print an inaccurate financial statement, Wilson testified, "Gary Quintinsky. And I say 'they.' Him or Ellynn Ogilvie." Wilson testified that she reported directly to Ogilvie on accounting issues, and she agreed with Texas Mutual's characterization of Ogilvie and Quintinsky as "co-leader[s] of the operation." Wilson testified that when she was preparing the documents that would be provided to Texas Mutual during one of the audits, Ogilvie told Wilson, "This is what we need the numbers to be." Wilson also testified that the documents she used to determine the payroll information were "solely provided" to her by Ogilvie.

Wilson denied having any involvement in the under-reporting of payroll to Texas Mutual, but she testified that she suspected that the payroll information that was being reported to Texas Mutual was not correct:

> When I took information in to the auditor, that was the only time that I ever dealt with workers' comp, . . . The information that I took in to the auditor didn't seem to be very much information compared to what I was seeing coming out of payroll. . . . I don't specifically know that it was right or wrong. It just didn't appear to be very much information, you know, very thick of a stack of papers.

Wilson added that because of the amount of payroll that she knew the United Crane Companies had, Wilson would have expected to have seen more paper and more information.

The jury also heard testimony from Heather Hill, an insurance agent through whom the United Crane Companies obtained their worker's compensation coverage with Texas Mutual. Hill testified in her video deposition that, in recent years, United Crane had been her agency's largest

account. Hill recounted that she primarily dealt with Ogilvie but would occasionally contact Quintinsky when Ogilvie was unavailable because he "seemed to be the person who knew the most about [United Crane's] equipment." However, according to Hill, Ogilvie "made most of the decisions and signed most of the documents." Nevertheless, Hill testified, Ogilvie and Quintinsky "were boyfriend and girlfriend and seemed to run things hand in hand."

Hill learned about United Crane Rental from Ogilvie. According to Hill, Ogilvie told her that "she wanted to separate personally" from Quintinsky, "and for that reason she was thinking about selling the assets of the business" to Quintinsky. Hill testified that she believed that Quintinsky and Ogilvie applied for insurance coverage as a new business because of the "personal problems" that Quintinsky and Ogilvie were having, and not because they were trying to avoid the high experience modifier of the United Crane Companies. Hill did not believe that there was anything illegal about establishing a new entity in order to "get another quote." Hill also testified that it was her understanding that during the time she was working with Quintinsky and Ogilvie, their business was generally growing, as was the number of employees working for them.

The jury also heard video deposition testimony from Quintinsky. In his testimony, Quintinsky pleaded the Fifth Amendment privilege against self-incrimination to the majority of Texas Mutual's questions, including those inquiring into the following:

- Whether he committed fraud against Texas Mutual;

- Whether the United Crane Companies misrepresented to Texas Mutual the nature and amount of their payroll;

- Whether he violated section 5.65 of the insurance code;

8

- Whether he conspired to and in fact accomplished an unlawful reduction of premiums;

- Whether he negligently misrepresented to Texas Mutual the true ownership, change of ownership, operations, or payroll of his companies;

- Whether he had a "scheme to hide payroll" from Texas Mutual;

- Whether he fully disclosed to Texas Mutual information concerning the insured company's true ownership, change of ownership, operations, or payroll;

- Whether he failed to disclose and fraudulently concealed to Texas Mutual material facts regarding how payroll was being run through numerous companies, that the payroll information being provided to Texas Mutual was grossly understated, and that many of the workers were not being reported; and

- Whether he participated in a conspiracy to defraud Texas Mutual of the insurance premium lawfully due in the amount of $834,025 for the 2000-2001 policy, $2,171,266 for the 2001-2002 policy, $2,055,454 for the 2002-2003 policy, and $2,084,812 for the 2003-2004 policy.

The jury was instructed that it was permitted, but not required, to draw the inference that the information Quintinsky withheld under the Fifth Amendment would have been unfavorable to him.

The district court submitted, and the jury found, that (1) the United Crane Companies and United Crane Rental, Inc. had each committed fraud against Texas Mutual;[3] (2) Quintinsky conspired with both the United Crane Companies and United Crane Rental, Inc. to damage Texas Mutual through their fraud; (3) by clear and convincing evidence, the harm to Texas Mutual resulted from the fraud of both the United Crane Companies and United Crane Rental, Inc.; and (4) Quintinsky secured the execution of a document by deception and the value of the property affected

---

[3] The district court's fraud submission included the instruction that the insureds owed Texas Mutual a duty of "good faith," meaning "honesty in fact in any conduct or transaction."

9

was $1,500 or more.[4]  In its actual damages submission, the district court instructed the jury to consider only the premiums that should have been paid under the insurance policies.  The jury awarded Texas Mutual $5,059,200.00 in connection with the United Crane Companies's policies, and $18,190.00 regarding the United Crane Rental policy.  The jury also awarded Texas Mutual $2,500,000.00 in exemplary damages.

The district court entered judgment on the jury's verdict.  Subsequently, Quintinsky filed a motion for new trial and a motion for judgment notwithstanding the verdict.  The district court denied both motions.  This appeal followed.

## DISCUSSION

**Evidentiary-sufficiency issues**

Quintinsky's third and fourth issues challenge the legal and factual sufficiency of the evidence supporting various jury findings.  We will sustain a legal-sufficiency complaint if the record reveals:  (a) the complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact.  *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005).  We review the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could

---

[4] The district court also submitted an issue on whether Quintinsky committed forgery.  The jury found to the contrary.

10

not. *Id*. at 807.  The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review.  *See id*. at 827.

When reviewing a challenge to the factual sufficiency of the evidence supporting a vital fact, we must consider, weigh, and examine all of the evidence in the record, both supporting and against the finding, to decide whether the verdict should be set aside.  *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).  We should set aside the verdict only if the evidence that supports the jury finding is so weak as to be clearly wrong and manifestly unjust.  *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).  But we may not merely substitute our judgment for that of the jury.  *Pool*, 715 S.W.2d at 635.  The jury remains the sole judge of witnesses' credibility and the weight to be given their testimony.  *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

Quintinsky challenges the legal and/or factual sufficiency of the evidence supporting three sets of jury findings.

### Findings relating to United Crane Rental, Inc.

Quintinsky challenges the legal and factual sufficiency of the evidence supporting the jury's findings that United Crane Rental, Inc. committed fraud and was liable for punitive damages, and that Quintinsky conspired with United Crane Rental to commit fraud and secured the execution of a document by deception affecting property with a value of $1,500 or more.  Quintinsky's argument, in its entirety, is as follows:

> There was undisputed evidence that the Appellee, in a conversation with Appellant's insurance agent, was fully advised of the circumstances surrounding the formation

11

of United Crane Rental, Inc, and only thereafter approved its application for coverage and issued the policy. Therefore, there is no factual basis for the jury's finding of intentional misrepresentation and deception. Quite to the contrary, the overwhelming weight of the evidence is that Appellee had all necessary information before issuing the policy.

Quintinsky is referring to the deposition testimony of Heather Hill. Hill testified about a telephone conversation she claimed to have had with a Texas Mutual representative concerning the ownership of United Crane Rental. According to Hill, the representative asked her "a series of questions" which led her to believe that the representative "understood what was required to apply for separate coverage." Hill also testified that she made the following inquiry to the representative: "You are aware of the issue with United Crane, Inc., and I want to make sure that this is not something that gets me in trouble. What are your rules about establishing a new entity so that we can get another quote?" There is no further testimony in the record from Hill about what the representative's response to this inquiry may have been. Hill identified the representative as a "Mr. Biernacki at Texas Mutual."

Hill's testimony falls short of conclusively establishing that Texas Mutual was aware of the relationship between the United Crane Companies, Quintinsky, and United Crane Rental. At most, it may tend to show that Quintinsky's insurance agent alluded to an "ownership issue" involving United Crane Rental. However, Hill provided little more than speculation that the "Mr. Biernacki" was made aware of the nature of the "ownership issue." There was no further testimony about this claimed conversation or any additional details of it. Furthermore, it appears from the context of the testimony that Hill was trying to explain why she believed that her actions

12

as United Crane's insurance agent were legal. The jury, as the sole judge of the credibility of the witnesses, could have chosen to disregard Hill's testimony as self-serving.

Additionally, the jury, as previously suggested, heard considerable evidence of Quintinsky's intentional efforts to mislead Texas Mutual. United Crane Rental's insurance application, which was signed by Quintinsky, was admitted into evidence. On the application, Quintinsky represents that he does not own, manage, or control any other business in Texas. Specifically, Quintinsky represented, "No entities with payroll." Quintinsky also represented that he did not receive workers from or share workers with any other business. These representations were inconsistent with evidence that Quintinsky owned and operated the United Crane Companies—companies that had employees. Therefore, the jury could have found that, contrary to Quintinsky's representation on the application, Quintinsky did own "entities with payroll" and that Quintinsky's deception was intentional.

Quintinsky also represented on the application that the address of United Crane Rental was 4042 Piping Rock Lane. Texas Mutual later discovered that the company's actual address was 5855 Kelley Street, the same address as the United Crane Companies. Turner testified that listing a home address as opposed to a business address on an insurance application "could make [Texas Mutual] think that [United Crane Rental] was a truly separate operation." From this evidence the jury could have inferred that Quintinsky was attempting to deceive and intentionally misrepresent to Texas Mutual the location of United Crane Rental to prevent it from connecting the companies. Also, when Texas Mutual attempted to conduct an audit of United Crane Rental, Quintinsky would not let the auditors enter the premises. The jury could have inferred from this evidence that

13

Quintinsky had something to hide. Finally, the jury heard Quintinsky's deposition testimony, in which he repeatedly invoked his Fifth Amendment privilege against self-incrimination when asked about his efforts to mislead Texas Mutual. For these and other reasons, the evidence supporting the jury's findings regarding United Crane Rental, Inc., was legally and factually sufficient.

### *Actual damages*

Quintinsky also challenges the factual sufficiency of the evidence supporting the jury's actual damages award. His argument, in its entirety, is as follows:

> [T]he overwhelming weight of the evidence is that (according to Appellee's own expert), the Appellee intentionally did not report the entire payroll to the NCCI, as required by law, and therefore could not attest to the accuracy of the damages sought. In other words, the Appellee intentionally chose to present figures which it admitted were not final.

Quintinsky is referring to testimony by Turner on cross-examination regarding the National Council on Compensation Insurance (NCCI). According to Turner, the NCCI is a national organization that the State of Texas has chosen to "gather workers' comp statistics and promulgate experience modifiers." Turner testified that when she determined additional payroll in order to calculate damages, she reported the numbers to the NCCI. She did this so that the NCCI could recalculate the experience modifier based on the new payroll. Turner testified that the recalculated modifier was lower than the previous modifier because the losses did not change while the payroll increased. However, Turner admitted that she did not report the entire payroll to the NCCI because "the remaining amount was in dispute" due to the ongoing civil litigation with Quintinsky. Turner testified that she would send in the additional payroll after the litigation was resolved. Therefore,

14

according to Quintinsky, the NCCI could recalculate the modifier after the litigation is resolved, which could result in a lower premium due. The lower premium, Quintinsky argues, could reduce the amount of compensatory damages.

Quintinsky's argument, however, is based on speculative testimony that the jury could have rationally chosen to reject. Turner testified that the NCCI *may* recalculate the modifier. When asked why she thought they would not recalculate the modifier, Turner testified, "Because we are seven years out from the 2000 policy year, and they have the discretion of whether or not to issue a revised modifier." Turner also testified that she did not know whether the NCCI would do anything with the information she sent them. Although she agreed with Quintinsky that "it stands to reason" that the modifier would go down, she did not know what would happen to the modifier or, if the modifier did go down, by how much it would go down.

Furthermore, Turner gave detailed testimony explaining how she calculated Texas Mutual's damages in this case. To summarize, Turner took into account the "actual true payroll reports that were filed with the Texas Workforce Commission" and compared them against payroll records from previous audits of the United Crane Companies. For the workers who had not been reported to Texas Mutual, if the records were not available to determine a proper class code, Turner was authorized to "just put it all in the highest rated code." This would result in a higher premium. However, Turner decided instead to "take a pro rata distribution based on the audits," which gave Quintinsky the "benefit of the doubt" on the unreported payroll. The experience modifier was also used in the calculation. Turner calculated a premium amount due for each policy period in which the United Crane Companies and United Crane Rental had been insured. Based on Turner's

15

calculations, the total premium due for all of the policy periods combined was "around 7.1 million" dollars. However, Turner later revised that figure downward because of a settlement reached with other defendants in this litigation.[5] The money obtained by Texas Mutual from the settlement (approximately $750,000, according to Turner) resulted in a reduction of both the experience modifier and the premium due under the policies. Turner testified that the revised number was "around 5.6 million" dollars. Turner concluded that, based on advice from Texas Mutual's counsel, she gave Quintinsky "every benefit of the doubt and every credit possible" to arrive at the final number. She termed this figure "the rock bottom, iron-clad damage figure in this case."

Turner's actual damage calculations, and many of the documents she used to calculate damages, were admitted into evidence without objection.[6] Finally, Turner added that she had

---

[5] In its original petition, filed on November 19, 2004, Texas Mutual sued multiple defendants involved in the alleged fraud, including the insurance agency involved in obtaining the policies for United Crane. Quintinsky was not one of the original defendants, but he was added at some point later in the litigation. According to the testimony of Turner, Texas Mutual settled with some of the defendants and obtained "default judgments" against others, including Quintinsky, although these settlements and judgments are not included in the record before us. At some point in the litigation, Quintinsky was granted a new trial, and Texas Mutual's claims against Quintinsky were severed from the original action.

[6] Also admitted into evidence without objection was an exhibit reflecting the breakdown of damages for each policy period in which the United Crane Companies were insured, and the period in which United Crane Rental was insured. The exhibit reflected the following:

TMI's Damages
    United Crane Co's

| | | |
|---|---|---:|
| | 00-01 | $ 99,058.00 |
| | 01-02 | $2,171,256.00 |
| | 02-03 | $2,055,454.00 |
| | 03-04 | $ 733,432.00 |
| Subtotal | | $5,059,200.00 |
| United Crane Rental | | $ 18,190.00 |
| Total | | $5,077,390.00 |

extensive experience in making these types of calculations, testifying that, "I've probably either personally done or reviewed three or 400 sets of calculations over the years."

We find that the evidence supporting the jury's damages award is not so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust.

### *Findings relating to the United Crane Companies*

Finally, Quintinsky asserts that there was "insufficient" evidence to support the jury's finding that Quintinsky was part of a conspiracy with the United Crane Companies to commit fraud against Texas Mutual. He also challenges the jury's finding regarding the United Crane Companies' liability for punitive damages. Quintinsky's argument, in its entirety, is as follows:

> Regarding Questions 2a and 3a, there is insufficient evidence of Appellant's participation in the alleged scheme vis a vis the United Crane Companies. There is insufficient evidence as to what Appellant's position was with the United Crane Companies, what role, if any, he had during the audit process and whether he knew that anything was being misrepresented to the Appellee. To the contrary, there is testimony that the President of the United Crane Companies, Ellyn[n] Ogilvie, was the main contact and dealt almost exclusively with insurance issues.

We disagree. Although there was evidence that Ms. Ogilvie was involved in the operations of the United Crane Companies, this does not preclude the jury from finding that Quintinsky was also involved in the conspiracy. The jury was instructed that to be a part of the conspiracy, Quintinsky and another person or persons or entity or entities must have had knowledge of, agreed to, and intended a common objective or course of action that resulted in the damages to Texas Mutual. There was evidence presented that would enable reasonable and fair-minded jurors to reach that conclusion. Wilson agreed with Texas Mutual's characterization of Quintinsky

17

as "the co-leader of the operation along with Ellynn Ogilvie." When questioned about who asked her to print an inaccurate financial statement, Wilson testified, "Gary Quintinsky. And I said 'they.' Him or Ellynn Ogilvie."

Hill also testified about Quintinsky's involvement. Hill testified that she would contact Quintinsky when Ogilvie was unavailable because Quintinsky "seemed to be the person who knew the most about the [company's] equipment." Hill further testified that she believed Quintinsky was "the vice president" of the United Crane Companies. When asked why she needed to get together with both Ogilvie and Quintinsky to "discuss ways in which to lower the modifier," Hill answered, "Because they were boyfriend and girlfriend and seemed to run things hand in hand." Additionally, in Quintinsky's deposition, when asked by Texas Mutual if he participated in a conspiracy to defraud Texas Mutual of the insurance premiums lawfully due under the policies for the United Crane Companies, Quintinsky pleaded the Fifth Amendment. The jury was instructed that in civil cases it was permitted to draw the inference that the information withheld under the Fifth Amendment would have been unfavorable to the witness.

Viewing the above evidence in the light favorable to the verdict, we conclude that the evidence is legally sufficient to support the jury's answers to these issues concerning the United Crane Companies.

We overrule Quintinsky's third and fourth issues.

18

**Con-tort**

In Quintinsky's first issue, he complains that the district court erred in denying his motion for judgment notwithstanding the verdict on the basis that Texas Mutual's claims "sounded only in contract," so "the jury's findings of fraud should be disregarded together with the award of exemplary damages." Quintinsky urges that Texas Mutual did not request, and the district court did not submit, "a question on the theory of fraudulent inducement" and that "the only legal theory was a breach of contract, for failure to provide the proper information during the audits after the policies ended." We reject these contentions.

The supreme court has held that "tort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract." *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors*, *Inc.*, 960 S.W.2d 41, 47 (Tex. 1998). The supreme court explained, "Allowing the recovery of fraud damages sounding in tort only when a plaintiff suffers an injury that is distinct from the economic losses recoverable under a breach of contract claim is inconsistent with this well-established law, and also ignores the fact that an independent legal duty, separate from the existence of the contract itself, precludes the use of fraud to induce a binding agreement." *Id*. The supreme court added, in a more recent opinion, that "[t]he duty not to fraudulently procure a contract arises from the general obligations of law rather than the contract itself, and may be asserted in tort even if the only damages are economic." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006).

19

Quintinsky attempts to distinguish these precedents by invoking the reasoning from *Classical Vacations, Inc. v. Air France*, No. 01-01-01137-CV, 2003 Tex. App. LEXIS 3160 (Tex. App.—Houston [1st Dist.] Apr. 10, 2003, no pet.) (mem. op.). In *Classical Vacations*, the defendant, a travel agency, contracted with the plaintiff, an airline, to sell plane tickets to passengers. 2003 Tex. App. LEXIS 3160, at *2. The travel agency had a contractual obligation to report to the airline the tickets that it issued. *Id*. The airline alleged that the defendant failed to report certain ticket sales. *Id*. at *3. The jury found in favor of the airline and awarded it both actual and exemplary damages. *Id*. at *4-5. The appellate court reversed the award of exemplary damages, holding that because the airline's claim "sounded solely in contract," the plaintiff was not entitled to an award of exemplary damages. *Id*. at *7. The court recognized the supreme court's holding in *Formosa Plastics*, but "decline[d] to extend *Formosa Plastics* to include fraud that occurs after the formation of a contract and that results only in loss to the subject of a contract." *Id*. The court added that the airline "did not plead and the jury did not find fraudulent inducement." *Id*.

*Classical Vacations* is distinguishable from this case. As previously discussed, the jury heard evidence that the fraud occurred throughout the relevant period and prior to the formation of each insurance contract at issue in this case. Further, we disagree with Quintinsky's assertions that the district court's submission of a fraud issue somehow did not encompass the theory of fraudulent inducement. *See Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*, 184 S.W.3d 840, 865-68 (Tex. App.—Austin 2006, pet. granted, remand by agr.). We overrule Quintinsky's first issue.

20

**Jury argument**

Finally, we address Quintinsky's second issue, in which he asserts that Texas Mutual made an incurable jury argument. He complains of the following statements by Texas Mutual's counsel during closing argument:

> You know, another reason why this type of situation is so serious is, when somebody cheats on something like their workers' comp, think about what a big cost that is for a lot of companies . . . . They pay workers' comp on a lot of their payroll. That's a big cost component for them.
>
> But when they cheat on their workers' comp and they don't pay that proper premium, who does that give them [an] advantage over? That gives them an advantage over the honest business person, the person that's paying the proper premium for the comp.
>
> If two companies are competing for a job and they both submit bids and one of them has been able to not pay $5 million worth of the premium they were supposed to pay, they can probably come in at a lower bid and get that job, versus some other company that's acting honestly. That's another way in which this type of thing causes harm.

Quintinsky claims that these statements run afoul of the principles discussed in *Philip Morris USA v. Williams*, 127 S. Ct. 1057 (2007), because they refer to harm to other businesses who were not parties to the litigation.

The jury argument that the Supreme Court found to be improper in *Phillip Morris* was the following:

> [T]hink about how many other Jesse Williams [the plaintiff] in the last 40 years in the State of Oregon there have been . . . . In Oregon, how many people do we see outside, driving home . . . smoking cigarettes? . . . [C]igarettes . . . are going to kill ten [of every hundred]. [And] the market share of Marlboros [i.e., Philip Morris] is one-third [i.e., one of every three killed].

21

127 S. Ct. at 1061. In response to this argument, Phillip Morris requested the trial court to instruct the jury that it was not "to punish the defendant for the impact of its alleged misconduct on other persons, who may bring lawsuits of their own in which other juries can resolve their claims . . . ." *Id*. The trial court rejected the proposed instruction. *Id*. The Supreme Court held that the Due Process Clause "forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties or those whom they directly represent, i.e., injury that it inflicts upon those who are, essentially, strangers to the litigation." *Id*. at 1063. At the same time, the Supreme Court recognized that harm to nonparties may be relevant to a determination of "reprehensibility," which is a factor that juries may consider in its decision to award exemplary damages: "[C]onduct that risks harm to many is likely more reprehensible than conduct that risks harm to only a few. And a jury consequently may take this fact into account in determining reprehensibility." *Id*. at 1065. However, "a jury may not go further than this and use a punitive damages verdict to punish a defendant directly on account of harms it is alleged to have visited on nonparties." *Id*. at 1064. Therefore, "it is constitutionally important for a court to provide assurance that the jury will ask the right question, not the wrong one." *Id*. In other words, the jury can seek to determine reprehensibility, but cannot seek "to punish for harm caused strangers." *Id*. The Supreme Court then addressed the "practical problem" that this distinction raised:

> How can we know whether a jury, in taking account of harm caused others under the rubric of reprehensibility, also seeks to punish the defendant for having caused injury to others? Our answer is that state courts cannot authorize procedures that create an unreasonable and unnecessary risk of any such confusion occurring. In particular, we believe that where the risk of that misunderstanding is a significant one—because, for instance, of the sort of evidence that was introduced at trial or the kinds of argument the plaintiff made to the jury—a court, *upon request*, must protect against

22

that risk. Although the States have some flexibility to determine what kind of procedures they will implement, federal constitutional law obligates them to provide some form of protection in appropriate cases.

*Id*. at 1065 (emphasis added).

Even assuming that Texas Mutual's argument was improper under *Phillip Morris*, Quintinsky did not object during trial or request a limiting instruction. Quintinsky has failed to preserve error. When a party fails to preserve error related to jury argument, it is not enough for him to show that the argument was improper; he must show that it was incurable. In other words, he must show that the argument was so prejudicial that it could not be cured by an instruction to disregard. *See Otis Elevator Co. v. Wood*, 436 S.W.2d 324, 333 (Tex. 1968). The test for incurable error in jury argument is whether the argument, when viewed in light of the entire record, was so inflammatory as to strike at the heart of the adversarial process or appeal to fundamental prejudices. *Hutton v. AER Mfg. II, Inc.*, 224 S.W.3d 459, 465 (Tex. App.—Dallas 2007, pet. denied); *Macias v. Ramos*, 917 S.W.2d 371, 375 (Tex. App.—San Antonio 1996, no writ). This is a heavy burden. The supreme court has explained that the complainant has the burden to prove that the argument by its "nature, degree, and extent" constituted reversibly harmful error. *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex. 1979). "How long the argument continued, whether it was repeated or abandoned and whether there was cumulative error are proper inquiries." *Id*. at 839-40. "All of the evidence must be closely examined to determine the argument's probable effect on a material finding." *Id*. "Importantly, a reversal must come from an evaluation of the whole case, which begins with the voir dire and ends with the closing argument. The record may show that the cause is weak, strong, or very close. From all of these factors, the complainant must show that the probability that

23

the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence." *Id*.

We conclude that Quintinsky has not satisfied this heavy burden. In his brief, he makes no showing of how the argument was incurable in light of the entire record. In fact, having reviewed the record, we find that the argument was not incurable. The record reflects that the allegedly improper argument was brief and not repeated. Nor was it "so inflammatory as to strike at the heart of the adversarial process or appeal to fundamental prejudices." *Macias*, 917 S.W.2d at 375. The argument merely referred to how dishonest businesses could place "honest" businesses at a financial disadvantage. In contrast, counsel in *Phillip Morris* accused the defendant of killing people. We conclude that it is unlikely that counsel's brief reference to the potential harm to "honest" businesses so inflamed the jury against Quintinsky that any impropriety could not have been cured by an instruction to either disregard, or to limit the jury's consideration of the argument to the issue of reprehensibility.

We overrule Quintinsky's second issue.

## CONCLUSION

Having overruled Quintinsky's issues on appeal, we affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Patterson, Puryear and Pemberton

Affirmed

Filed: April 30, 2008